## STATE vs. ELMER COLLINS.

*Criminal Law—Homicide—Murder—Malice—Circumstantial Evidence—Character Testimony—Reasonable Doubt.*

1. Murder of the first and second degree, manslaughter and malice defined.

2. Direct and circumstantial evidence defined. The rule relating to circumstantial evidence is, that when the evidence is circumstantial, the jury must be fully

satisfied, not only that the circumstances are consistent with the guilt of the prisoner, but they must be also satisfied, that the facts are such as to be inconsistent with any other reasonable conclusion than that the prisoner was the guilty party. They must be such as to exclude auy other hypothesis or conclusion.

3. Reasonable doubt defined.

4. Expert testimony is the evidence of persons who are skilled in some art, science, profession or business; which skill or knowledge is not common to their fellow men, and which has come to such experts by reason of special study and experience in such art, science, profession or business. The value of such testimony depends upon the learning and skill of the expert and varies with the circumstances of each case. The jury should take into consideration the expert's means of knowledge, and the reasons he assigns for the opinions he has given ; and give credence to his testimony as they may find his qualifications sufficient and his reasons satisfactory. The jury may accept or reject the conclusions of experts, as in their judgment they may or may not be found consistent wtth reason and experience, or otherwise satisfactory. Such testimony is to be considered like any other testimony, and is to be tried by the same tests, and receive just as much weight and credit as the jury may deem it entitled to, viewed in connection with all the evidence in the case.

5. Proof of good or bad character, whether it relates to witnesses, or to the accused, is to be considered by the jury as any other evidence tending to credibility, or innocence or guilt, as the case may be ; and is entitled to just so much weight as the jury may deem just, in connection with all the other evidence in the case.

*(March 16—25, 1903.)*

LORE, C. J., and GRUBB and PENNEWILL, J. J., sitting.

*Herbert H. Ward,* Attorney-General, and *Robert H. Richards,* Deputy Attorney-General, for the State.

*Robert C. White and Charles F. Richards* for the defendant.

At a Court of Oyer and Terminer, in and for Sussex County, beginning March 16, 1903, the defendant, Elmer Collins, was placed upon trial upon the charge of MURDER IN THE FIRST DEGREE for the felonious killing of his wife, Alda Collins, on the twelfth day of April, 1902.

At the trial, the State proved the following facts : That on the twelfth day of April, 1902, Alda Collins, the deceased, was found

dead in the stable connected with the carriage house of the prop-
erty where she lived with her husband, near the town of Laurel in
Sussex County; that she was seen by none of her neighbors mov-
ing around the premises that morning; that about eight o'clock in
the morning of the day of the killing, the defendant, Elmer Col-
lins, came over from his house to the house of one George Henry,
who lived a short distance away and in plain sight of Collins'
house, and there informed the members of the Henry family of
the fact that Mrs. Collins had been killed, and that the members
of the Henry family went over immediately to the Collins house,
and from time to time other persons gathered; that they went into
said carriage house and found Mrs. Collins lying in the stable part
of the same, partly upon her stomach, dead; that her face was in
the horse manure and corn stalks with which the earth floor of the
stable was covered.  That when found she had upon her head
three wounds, and on her forehead a severe contusion, and her
throat cut with a deep gash running nearly back to the vertebræ in
her neck; that the wounds upon the head, involving a fracture of
the skull, probably would have caused death and that the wound
in the neck unquestionably would have caused death, which indi-
cated that she had been killed for a considerable period,—for hours
at least; that upon her face, as she lay in the manure, were blood
stains, and that those blood stains were dry; that the blood in the
wound in the neck had coagulated and had practically dried there,
all of which indicated that the deceased had been killed for a con-
siderable time before her body was found.

It was further proved by the State that the carriage house or
stable in which the body was found had four compartments or
rooms in it; that a door just large enough for a carriage to be
taken in opened into the carriage house, which was just about large
enough to hold a carriage, with a space sufficient to walk along by
the carriage back into some stalls; that on the right-hand side of
the wide door opening into the carriage house was a smaller door
for the purpose of going in and out; that on entering the carriage
house, on the right-hand side you first came to a corn crib, about

six or eight feet square, which was used for the storing of corn; that next you came to a door opening into what was called the stable, which was practically a stall about twice the size of the ordinary stall in a stable; that a door opened from the carriage house into this stall, and by passing right through you could go through a door into a pound into which the horses were sometimes turned; the stall of the stable being the second apartment on the right-hand side of the building, was where Alda Collins, the deceased, was found; that right behind that was a stall or two of about the same size, and back of that was another room or space used for cows; and that in the back part of the carriage house there was a ladder which led to the loft.

The theory of the State, from the circumstantial evidence offered, was that the deceased was not killed in the stable, but that she was killed in the corn crib, being the compartment in the carriage house next to the stall in which the body was found; that during the day on which she was found and also the preceding day the corn crib was fastened and that only upon the third day did any person get into the corn crib to see what was in there, and that when they got in they found that on the partition between the corn crib and the stable where the woman's body was found, at a short distance above the floor, was a wide, thick blood stain, and that directly underneath the blood stain on the floor of the corn crib was another blood stain wider and longer, and that scattered over the floor on the corn and other places near and upon the adjacent boards were other splatters of blood; that upon a scientific examination and testing by an expert of said blood spots found in the corn crib, the same were pronounced beyond all reasonable scientific doubt to be human blood, and that the person who killed Alda Collins killed her in a place where he could have concealed it by closing the door only, as it was closed for two days, and that her slayer took her from a place of concealment, after delivering the fatal wounds, out into an open stable where she could be easily discovered.

The State further proved that the defendant made various statements in regard to the occurrences at his house that morning, that these statements varied in material particulars, and that said statements also varied from the facts in the case, so as to indicate that they were false.

The State further proved that upon the top part or apron of the overalls worn by the defendant when he called George Henry's family over to his place that morning, there were blood stains; that these blood stains were put upon the garment when the blood was fresh; that the defendant accounted for the blood stains by saying that he lifted up his wife out of the manure of the stable and pressed her to his breast and kissed her, further stating that when he laid her down he put her face back in the manure; also that he took his two small children in his dearborn, with some farming implements that morning, and went into a back field to do some cultivating, leaving his wife to do some chores at home, when she was to join him and the children in the field, and that he returned to the house from the field in something like an hour, when he found his wife dead in the stable. The State proved that if such had been true, the blood which had oozed from the wound would have been in such condition that it would not have produced the stain which was found upon the flap or apron of the said overalls of the defendant; said stain having been proved by the State to be infiltrated blood passing through the meshes of the garment, which could only be the case with fresh, warm blood, and not with coagulated blood. That upon the right leg of the overalls which the defendant wore that morning, according to his own statement, was a splatter of blood, which the State proved could only have been made there as the blood spurted from a human body, said splatter of blood having the formation and the gloss, not of a smear, but of a spurt of blood.

The State also produced and offered in evidence the instrument with which it claimed the killing was done, being a large iron bar found in the carriage house after the murder was committed,

which instrument the State claimed was amply sufficient to have produced the fatal wounds.

The State further contended, that from the facts proved, it was evident that the defendant came upon his wife as she was stooping down in the corn crib and struck her from behind with the iron bar referred to, that then she was pushed, or forced or leaned against the side wall in the corn crib, producing the stain found thereon, and falling down upon the floor produced the stain there found, and that after she had bled sufficiently for all of said blood stains to be made, the defendant concluded it was better to draw her out of a place of concealment into a place of openness, and that he took her out of a closed room into an open room, viz., to an open compartment or stable; that after delivering the fatal blow the defendant dragged his wife from the door of the corn crib, with his arms under her arms and her head resting upon the apron or flap of his overalls, to the stable, where her dead body was subsequently found, and threw her upon the manure, and that it was while so dragging her that the warm blood from the wounds in her head infiltrated through the meshes of his overalls, producing the identical stain afterwards found upon said garment.

As regards a motive for the slaying of the deceased, the State proved that prior to the time of the killing, the defendant had an intimacy with a young woman, that he was, a short time prior thereto, trying to induce her to go away with him; that he had told her that he would clear the way for their plans; and the theory of the State upon that matter was that the other love of the defendant and the fact that his wife stood in the way of the consummation of his plans, caused a dispute to arise over this person, in which the wife may have exhibited some jealousy and which may have been followed by quarrels, which led finally to the killing of the woman by her husband, the defendant.

LORE, C. J., charging the jury:

Gentlemen of the jury:—It is not disputed, that on the twelfth

day of April, 1902, the dead body of Alda Collins was found in the stable part of a building on the farm near Laurel, in this county, on which she with her husband Elmer Collins, the prisoner, and their two small children had theretofore been living. The body was covered with blood; the face was bruised; the nose was broken; the back and side of the skull were crushed in and the throat was cut.

The indictment charges that she was killed by Elmer Collins, her husband, and that he is guilty of murder of the first degree.

Inasmuch as under this indictment, you may find the prisoner guilty of murder of the first degree, or of the second degree, or of manslaughter, if in your judgment the evidence shall so warrant; it is necessary for the Court to define these three grades of felonious homicide.

(1) Murder of the first degree, consists in taking a human life with express malice aforethought, or in perpetrating or in attempting to perpetrate a crime punishable with death. That is to say, when such life is so taken with a sedate, deliberate mind and formed design to take the life of, or to do some great bodily injury to the person whose life is so taken.

(2) Murder of the second degree is where there is no such deliberately formed design to take life, or to perpetrate or attempt to perpetrate a crime punishable with death; but where, nevertheless, the killing is without justification or excuse; without any, or without sufficient provocation to reduce the homicide to manslaughter.

(3) Manslaughter is the unlawful killing of a human being without malice aforethought.

Malice is the essence of murder.

In murder of the first degree such malice must be express, and may be indicated by all such facts and circumstances as show a deliberately formed design to take life.

In murder of the second degree, malice may be shown by such cruel acts and conduct, as indicate a reckless disregard of

human life, although unaccompanied with a deliberate design to take life.

In manslaughter there is no malice.

Bearing in mind these distinctions, it is your duty to inquire into the guilt or innocence of the prisoner.

Whenever the life of one person is proved to have been taken by another, it is presumed in law to have been taken with malice aforethought, unless the contrary appears.

Crime may be proved either by direct or by circumstantial evidence, or by both.

Direct evidence is such as the confessions of the accused or the testimony of persons who saw the crime committed.

Circumstantial evidence consists of the suspicious facts and circumstances which surround a case, but which lack the direct or positive character.

The universal experience of those engaged in the administration of justice shows the absolute necessity of admitting and relying upon circumstantial evidence, in forming our conclusions in regard to the guilt or innocence of accused persons; and when clearly convincing and conclusive, is of equal weight with direct evidence. Indeed it is often the only means of uncovering and proving crimes which are committed in secret and which are concealed by the cunning artifices of the perpetrator.    But while this is so, we say to you most emphatically that circumstantial evidence, to warrant a conviction, must be entirely satisfactory, and of such significance, consistency and force, as to produce conviction in the minds of the jury, of the guilt of the accused beyond a reasonable doubt. The great rule on this subject is this: that when the evidence is circumstantial the jury must be fully satisfied not only that the circumstances are consistent with the guilt of the prisoner, but they must also be satisfied, that the facts are such as to be inconsistent with any other reasonable conclusion than that the prisoner was the guilty party.    They must be such as to exclude any other hypothesis or conclusion.

This is the rule relating to circumstantial evidence, as distinguished from direct evidence. The State claims to have produced in this case both direct and circumstantial evidence.

But whether the evidence be direct, or circumstantial, or both, it must in every case be of such a character as to satisfy the minds of the jury of the guilt of the prisoner beyond a reasonable doubt.

Such a doubt, gentlemen, must not only be reasonable under the facts disclosed in the case, but must grow out of the evidence as you have heard it here, and must be of such a character as to prevent your minds from reaching an honest conclusion of the guilt of the accused, after a most careful and conscientious consideration of all the facts, circumstances and conditions surrounding the case. If after such consideration there remains in your mind such a reasonable doubt of the guilt of the prisoner, you should acquit him.

The burden of proof is upon the State. All the presumptions of law, independent of evidence, are in favor of innocence, and every person accused of crime is presumed to be innocent until proved guilty.

Expert testimony is the evidence of persons who are skilled in some art, science, profession or business; which skill or knowledge is not common to their fellow-men and which has come to such experts by reason of special study and experience in such art, science, profession or business. The value of such testimony depends upon the learning and skill of the expert and varies with the circumstances of each case. The jury should take into consideration the expert's means of knowledge, and the reasons he assigns for the opinions he has given, and give credence to his testimony as they may find his qualifications sufficient and his reasons satisfactory. The jury may accept or reject the conclusions of experts, as in their judgment they may or not be found consistent with reason and experience or otherwise satisfactory. The testimony of experts is to be considered like any other testimony, and is to be tried by the same tests, and receive just so much weight and credit

as the jury may deem it entitled to, viewed in connection with all the evidence in the case.

The testimony of detectives, of police officers, and of relatives of accused persons is to be taken and considered in like manner.

Proof of good or bad character, whether it relates to witnesses, or to the accused, is to be considered by you as any other evidence tending to show credibility or innocence or guilt, as the case may be; and is entitled to just so much weight as the jury may deem just, in connection with all the other evidence in the case.

Like consideration is to be given to proof of marital relations subsisting between the prisoner and his deceased wife at and before the time of her death.

From the nature of the evidence, and the mystery attending this homicide, the testimony in this case has necessarily occupied many days. Both your patience and endurance have been largely taxed. That testimony is now all before you. It has been presented and argued with great care by counsel, both on the part of the State and of the prisoner.

From that evidence, and from that alone, you are to reach your verdict, after the most thoughtful and conscientious consideration of it, under the solemn obligation of the oath you took when you entered that jury box.

If after such consideration you are not satisfied beyond a reasonable doubt that the prisoner did kill his wife in the manner laid in the indictment, your verdict should be not guilty.

Should you believe, however, that he did kill her in such manner, unlawfully, but without malice, your verdict should be guilty of manslaughter.

Again, if you believe that he killed her in such manner, cruelly and wantonly, but without express malice aforethought, you should find him guilty of murder in the second degree.

But if you believe, that he killed her in such manner, with sedate, deliberate mind and formed design to take life, then your verdict should be guilty in manner and form as he stands indicted.

Verdict, not guilty.